**Ross C. Goodman, Esq., Nevada State Bar No. 7722**
**GOODMAN LAW GROUP**
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 383-5088
(702) 385-5088 (Facsimile)

**Samuel H. Rudman, Esq., New York State Bar No. SR7957**
**David Rosenfeld, Esq., New York State Bar No. DR7564**
**Joseph Russello, Esq., New York State Bar No. JR2041**
**COUGHLIN STOIA GELLER RUDMAN & ROBBINS, LLP**
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100
(631) 367-1173 (Facsimile)

**Jack G. Fruchter, Esq., New York State Bar No. JF8435**
**ABRAHAM FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
(212) 279-5050
(212) 279-3655 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT LOWINGER, Individually and On Behalf of All Others Similarly Situated, | ) ) |
| | ) Case No.: |
| Plaintiff, | ) |
| | ) **CLASS ACTION COMPLAINT FOR** |
| vs. | ) **VIOLATIONS OF FEDERAL** |
| | ) **SECURITIES LAWS** |
| MGM MIRAGE, J. TERRENCE LANNI, | ) |
| JAMES J. MURREN, DANIEL J. D'ARRIGO | ) **JURY DEMAND** |
| and ROBERT H. BALDWIN, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by MGM Mirage ("MGM" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of the common stock of MGM between August 2, 2007 and March 5, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Robert Lowinger, as set forth in the accompanying certification incorporated by reference herein, purchased the common stock of MGM during the Class Period and has been damaged thereby.

7. Defendant MGM is a Delaware corporation whose principal executive officers are located at 3600 Las Vegas Boulevard South, Nevada 89109. MGM describes itself as one of the world's leading development companies with significant gaming and resort operations. MGM acts largely as a holding company and its operations are predominately conducted through its wholly-owned subsidiaries. The Company primarily owns and operates casino resorts, and offers gaming, hotel, dining, entertainment, retail and other resort amenities. MGM's common stock is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "MGM."

8. (a) Defendant J. Terrence Lanni ("Lanni") served as MGM's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") from the start of the Class Period through December 1, 2008, when defendant James J. Murren ("Murren") assumed those positions purportedly as a result of Lanni's planned retirement, effective November 30, 2008. After his replacement, Lanni remained a member of the Board.

(b) Defendant Murren served as MGM's President, Chief Financial Officer ("CFO"), Treasurer and member of the Board from the start of the Class Period, and, on or about August 21, 2007, ceased serving as the CFO and Treasurer and assumed the position of Chief

- 2 -

Operating Officer ("COO"). In connection with Lanni's retirement effective December 1, 2008, Murren relinquished his other positions and replaced Lanni as Chairman and CEO.

(c)     Defendant Daniel J. D'Arrigo ("D'Arrigo") served as MGM's Senior Vice President ("SVP") – Finance from the start of the Class Period, and, on or about August 21, 2007, ceased serving in that capacity and was named Executive Vice President and CFO.

(d)     Defendant Robert H. Baldwin ("Baldwin") served as President and CEO of Mirage Resorts, Incorporated from June 1, 2000, and, on or about August 21, 2007, ceasing serving in that capacity and assumed the position of Chief Design and Construction Officer of the Company. He has also served as President of Project CC, LLC, the managing member of CityCenter Holdings, LLC, since March 2005, and as President and CEO of Project CC, LLC since August 2007. He frequently participated in earnings conference calls with Defendants Lanni, Murren and D'Arrigo during the Class Period, and was supposed to participate in those calls for which he was not present.

(e)     Defendants Lanni, Murren, D'Arrigo and Baldwin are collectively referred to herein as the "Individual Defendants," and, together with MGM, as the "Defendants."

9.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of MGM, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with MGM, each of the Individual Defendants had access to the adverse undisclosed information about MGM's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MGM and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MGM common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding MGM's business, operations, management and the intrinsic value of its common stock; (ii) enabled certain of the Individual Defendants and other

- 5 -

MGM insiders to sell nearly $91 million of their personally-held common stock to the unsuspecting public; and (iii) caused Plaintiff and other shareholders to purchase MGM common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the common stock of MGM during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MGM common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MGM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MGM; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS[1]

21. The Class Period commences on August 2, 2007. On that date, MGM issued a press release announcing "record" financial results for its second fiscal quarter, providing, in pertinent part, as follows:

---

[1]    All emphasis is added unless otherwise noted.

LAS VEGAS, Aug 02, 2007 /PRNewswire-FirstCall via COMTEX News Network/ - - MGM MIRAGE (NYSE: MGM) today reported its second quarter 2007 financial results, achieving the Company's highest ever second quarter diluted earnings per share from continuing operations of $0.62, a 27% increase over the $0.49 per share earned in 2006. Earnings benefited from strong revenue trends, solid operating margins, and profits from sales of Tower 3 of The Signature at MGM Grand.

Net income per share on a diluted basis, including discontinued operations, was $1.22 per share compared to $0.50 per share in 2006. During the second quarter, the Company recognized a pre-tax gain of $201 million on the sale of Primm Valley Resorts and a pre-tax gain of $63 million on the sale of its Laughlin Properties -- Colorado Belle and Edgewater.

Net revenues for the second quarter increased 10% to $1.9 billion, an all-time record quarter for the Company. In addition to the incremental revenue from Beau Rivage, which reopened in August 2006, the Company benefited from strong hotel revenues and the impact of new amenities at many of its Las Vegas Strip resorts.

22.    Commenting on these results, Defendant Lanni stated, in pertinent part, as follows:

"Our targeted capital investments, particularly in our non-gaming operations, have led to strong returns and record earnings . . . The opening of MGM Grand Detroit and MGM Grand Macau later this year, and our recently announced joint venture project with Kerzner International, *further illustrate the powerful momentum created by our accelerated growth platform*."

23.    Defendant Murren also made positive comments regarding the financial results, as

well as the construction of MGM's CityCenter development, as follows:

"*Our operating results this quarter once again prove the power of our portfolio to generate consistent cash flows* . . . More exciting is the pace of future growth. We will continue to develop strategic relationships designed to create additional value from our significant real estate portfolio. *Of course, CityCenter is at the heart of our growth strategy; we are very pleased with the quality of the development and the pace of residential sales, and we continue on track for a late 2009 opening*."

24.    Following the issuance of the press release, Defendants Lanni and Murren, along with

other MGM representatives, conducted an earnings conference call with analysts and investors

during which they reiterated the Company's financial results and expounded on its prospects.

25.     In his opening remarks, Defendant Lanni represented that MGM's fundamentals were

"clearly strong," and tied those remarks to the Company's hotel results and cash flows, stating, in

pertinent part, as follows:

> As far as operating results, net revenues increased 10% to $1.9 billion, up 4%
> excluding Beau Rivage, an all-time record revenue quarter for the Company. *Our
> fundamentals are clearly strong, as evidenced by tremendous hotel results and
> excellent cash flow results across our portfolio of resorts.* As mentioned in the
> release, we had all-time record second quarter property EBITDA of $686 mil-lion,
> which represents a 9% increase over the prior year. Las Vegas Strip occupancy
> percentage of 97.8% was our Company's highest occupancy since 2000. Combined
> with a strong average room rate of $162 our Las Vegas Strip REVPAR was up 7%.
>
> *Demand has remained robust, and increased visitor volume to our Las Vegas trip
> resorts continues to drive revenues.* MGM Grand Las Vegas earned $108 million of
> EBITDA, which is an all-time record for any quarter in that property's history, and a
> 43% increase from the prior year.

26.     He also noted that "*construction is progressing nicely*" at the CityCenter and that

MGM Grand Macau was "on-track for opening . . . later this year," stating, in pertinent part, as

follows:

> *On CityCenter, construction is progressing nicely.* For those of you who have a
> chance to see it from time to time, it is really coming up and out of the ground with
> each of its property development portions of it. We have reached the 22nd floor at
> the CityCenter Hotel and Casino Tower, and the resorts, show room, convention
> center and parking garage are well underway.
>
> *        *        *
>
> *MGM Grand Macau is on-track for opening as we have said all along later this
> year*, and we will share more details on its opening on our next quarter's conference
> call. We formed MGM Mirage Hospitality, which is headed up by Gamal Aziz, who
> remains as President of MGM Grand Las Vegas. Hospitality will oversee our
> Foxwoods and [Batelaan] Development Company, and the Diaoyutai Guest House
> partnerships, among its other activities. *We are working on some very exciting
> projects and look forward to sharing those with you when we are able to, for this
> new development and new subsidiary.*

27. In his remarks, Defendant Murren also spoke positively about the Company's ability

to generate revenues from its portfolio of resort properties, and represented that 2007 would be "at

least as good as 2006," stating, in pertinent part, as follows:

> EBITDA was $686 million, that was up 9% versus the prior year. Terry mentioned
> there were several records and highlights. *But I think the key takeaways were that
> we generated significant cash flow increases across all market segments, even
> while we are making substantial improvements to resorts* like Luxor, Monte Carlo,
> and Excalibur, we saw very strong traffic and profit right from the economy segment,
> and right up through our highest end properties from a volume perspective.
>
> *We believe that we can continue to generate very strong returns from these kind of
> investments, as evidenced by our margins, which are very strong still*, they are 33%
> in the current quarter if you exclude out Beau Rivage and the Signature. *I think now
> we have half the year underway, we can say with some confidence that 2007 looks
> like it is going to be a solid year in Las Vegas here, as we capitalize on its market's
> increased popularity, and it looks like it is going to be at least as good as 2006*.

28. Defendant Murren also made a host of claims about the positive conditions and trends

the Company was experiencing. For example, he claimed that Las Vegas was "on-track to have a

very solid year" and that MGM's trends had "improved" and would continue to do so, investments in

its properties continued to "yield immediate returns" and that it continued to work on "very exciting"

and lucrative strategic partnerships. Specifically, Murren stated, in pertinent part, as follows:

> *We continue to believe, as looking out into the future here, that we will see strong
> operating trends, particularly here on the Las Vegas Strip*, REVPAR we expect to
> be again strong in the current quarter. *Operating margins we also believe will
> remain strong, to say with half a year under the belt, we feel more confident to say
> that Las Vegas is on-track to have a very solid year. We think that our trends have
> improved*, second quarter was certainly better than the first, in terms of some
> important revenue and volume metrics, slot volume, occupancy, building of rate, *all
> underlying demand metrics that we are very happy with*.
>
> *We continued to invest in these properties, and the investments yield immediate
> returns*. And therefore we believe that you will see the greatest delta in our property
> performance, at the properties that are getting the major investments, and a lot of
> those properties are the Mandalay Resort Group properties. *We continue to work on
> some pretty exciting strategic partnerships*, Terry mentioned the Kerzner one. That

is an example of things that we can do and are working on. *And we believe that we can significantly monetize the value of our brands and our substantial real estate holdings, in the quarters and years ahead.*

John mentioned MGM Grand Detroit. *It cannot be overemphasized how strong we are, and how excited we are about the opening of that property.* And as well of the MGM Grand Macau property that also opens up in the fourth quarter, and we expect them to be the market leaders, and *expect them to contribute significantly to our earnings in 2008.*

29.     During the question-and-answer session following the opening remarks, Murren and

Lanni both claimed that business was faring exceedingly well at that time and would continue to,

stating, in pertinent part, as follows:

- **Murren**: "[T]he underlying business on the high end for us is still quite strong. * * * The fundamental business on the high end is still firm. We had very strong customer activity in the quarter."

- **Lanni**: "[W]e are holding our business very well with existing customers and historical customers. * * * And clearly Jim you are right. In the national business we are doing quite well and exceeding expectations, very frankly, in a very robust economy is helping us, but that is moving very much in that way."

30.     Moreover, Murren, with Lanni's approval, represented that the Company freely had

access to sufficient financing to fund its portion of a joint venture with Kerzner International, stating,

in pertinent part, as follows:

We put that in our pocket, and that $1.2 billion equity, of land and cash equity, we believe will be more than sufficient to raise the bank debt capital that we expect will largely fund the project, and between Kerzner and MGM Mirage as sponsors, *the ability for us to raise money in the bank market is I don't think, I don't think has any question. And we could do that today if we felt like it.*

31.     As reflected in the following exchange with an analyst, Murren further represented

that the partners with which MGM was in talks could go through with any project under

consideration because of their lack of exposure to the tightening (if not entirely dry) credit markets,

which meant that any such project would not experience delays:

**FELICIA HENDRIX [Analyst, Lehman Brothers]**: Okay, that is great. Along those lines as we try to forecast, or think about future projects that you might do domestically, given your experience, probably given the quality of the partners that you are going to be working with, even in light of this environment *do you see risk or maybe timing delays, on any kind of future domestic JV projects you might have in the pipeline*?

**JIM MURREN**: Well the folks we are talking to, Felicia, are not looking at the CMBS market. *The folks we are talking to are very, very large strategic partners, nongaming strategic partners. And other investors that are not dependent upon the day-to-day fluctuation of the credit markets*. The work that we are doing which is constant, has not abated whatsoever in the past month.

32.     In addition, Murren reiterated this point several times later during the call,

emphasizing the interest that various third-parties had in MGM, as well as the fact that the Company

had sufficient sources of capital available to finance additional strategic ventures stating, as follows:

[W]hat we recognized through the original 13[D ]filing in the process that ensued from that, was *there is an enormous amount of demand from a variety of sectors, on trying to partner up with us*, whether that be passive money, insurance companies, pension money, and the financial segment, to other financial sponsors, whether it is PE money, or hedge funds, or otherwise, to the strategic side where we have been very encouraged, and *actually quite surprised about the quality and size of companies in the nongaming arena. But large companies nonetheless, that are interested in perhaps partnering up with a company like MGM Mirage, given our position in the marketplace*.

                              *       *       *

A lot of people very frankly who want to invest with us, there are a lot of people who want to work with us, and that is coming through very well.

                              *       *       *

So the tables have turned a little bit, *where we are getting approached by people that are more than willing to put up capital*, and they seem to be very successful once they do so, and it allows us to upgrade these properties at a much lower cost to us.

33.     During the following exchange with an analyst, Murren also made it clear that the

Company, as well as its prospective partners, were, by design, not beholden to the credit markets and

thus could accomplish additional projects without fear of a lack of financing:

**HARRY CURTIS [Analyst, JPMorgan Chase & Co.]**: I try to do the opposite of Larry. *If you could talk about where your cash might come from over the next couple of years, outside of cash flow from operations*. You have talked a little bit about where it could be extracted from the Kerzner partnership, *is there much that we could expect coming from those kinds of transactions*? And also do you have any appetite for selling individual, or groups of assets? Could you see some cash coming in that way, and what do you do with if?

**JIM MURREN**: Well, we would like to say we planned perfectly for this day, and that we knew exactly what was going to happen in the credit markets over the past 3 weeks, but of course we didn't. *But we did want to make sure that we had enormous amount of financial flexibility going into 2007*, because we knew we were going to spend about $3 billion this year.

That is why we were very active issuers of bonds through '06 throughout, and into '07 and doing a large deal in the second quarter. That put us in the position that we are in today. Which means *we are not dependent upon nor expect to be in the bond market at all this year*, and probably won't see the bond market until some time next year, *as I said we have substantial amount of bank capacity, and our banks love us*. They should, we are good guys. We have a substantial relationship with our banks that is very productive on a going forward basis. *Between our bank facility which is large, the largest in our industry, and our cash flows, we feel very comfortable about our financial needs over the coming period of time*.

From a standpoint of joint ventures, these joint ventures you know we have put in the land as equity. We are getting cash back. If we do this a couple more times, which I expect that we will, we will get more cash back. These properties are unlevered. So *when we go out and do deals, we are not the kind of joint venture partner, that needs to access the CMBS market, or the bond market*.

We go out and talk to our friends the banks, and we go out and do nonrecourse bank deals, and *they are lining up to do that with us even today*. So joint ventures become immediately balance sheet positive, they provide us with a platform to provide bank financing, and provide us with an opportunity to grow quite rapidly.

As it relates to selling assets, we do that, too. We sold two major groups of assets last quarter alone. *And we are constantly getting pinged by people that want to buy some of our properties*. And I would bet that there will be properties that we do sell, small ones over time. As we continue to do what good portfolio managers should do. That is emphasize your winners, and cut your smaller properties away.

In terms of existing major properties, there has been a major initiative underway, where *people have approached us about partnering up with existing resorts, or existing development projects*. Both of which we are open-minded to. So we look at the opportunities today, as not just simply greenfield construction opportunities, of

which we are working on a few others. But also more broadly within our asset spectrum.

So I think we have got a little bit lucky in the sense that, there is a lot of interest in gaming from a variety of investors that we had not anticipated a year ago. We made some luck by buying land at the right time and buying companies at the right time. *And we have been very, I think fortunate in our timing of accessing the credit markets, so as to give us an awful lot of latitude and time, to see how this whole market shakes out*.

34. In response to this highly positive news, MGM's stock price rose 3.58% to $74.89 per share on unusually high volume of nearly 4 million shares traded. Moreover, as the market digested this information, the Company's stock price periodically rose over the next several days, increasing 1.23% to $75.81 per share, and 4.43% to $77.80 per share, on August 3 and 7, 2007, respectively.

35. The August 2, 2007 statements set forth above were materially false and misleading because, *inter alia*: (i) it was becoming increasingly less likely that the Company would be able to line up sufficient financing to fund its portion of the CityCenter project, as a result of tightening credit markets; (ii) MGM was not insulated from the deterioration in the credit markets; (iii) MGM's transaction partners were not insulated from the day-to-day fluctuations in the credit markets; and (iv) MGM's prospects and financial condition were contingent on servicing the massive amounts of debt that it had coming due and the continued prosperity of the Las Vegas market, which was beginning to show signs of weakness.

36. On August 22, 2007, MGM issued a press release announcing its formation of a long-term relationship with Dubai World, an investment holding company which had agreed to invest approximately $5 billion in MGM. Specifically, the investment was to consist of: a $2.7 billion investment in CityCenter, which would give Dubai World a 50% interest in a holding company that owned CityCenter; and up to $2.4 billion in purchases of MGM common stock, through a public

- 14 -

tender offer and direct purchases from the Company, which would give Dubai World a 9.5% equity

stake in the Company at $84.00 in cash per share. Defendant Lanni commented on the transaction as

follows:

> "This is a transforming event for MGM MIRAGE and Las Vegas . . . This
> partnership with Dubai World brings us a relationship with an internationally-
> respected developer of large- scale luxury properties that attract an international
> clientele. Dubai World's proficiency in real estate, combined with our company's
> operational expertise, strong brands and world-renowned resorts, *creates competitive
> advantages that we believe will benefit all of our stakeholders*. We are extremely
> pleased to be working with Dubai World. We have a tremendous amount of respect
> for Sultan Bin Sulayem and all that his company has accomplished."
>
> "*This transaction is immediately accretive to long term earnings and will have a
> profound impact on our balance sheet. Dubai World is making a significant
> investment in our company that will greatly increase our growth and earnings*. We
> welcome Dubai World's long term commitment to our company through the joint
> venture and these share purchases . . . ."

37.    In response to this news, the price of MGM common stock rose 8.91% to $80.94 per

share on extremely heavy volume of more than 8 million shares traded. The stock price also rose

2.3%, to $82.80 per share, the following day.

38.    Then, on October 1, 2007, MGM issued a press release announcing "several major

personnel changes and promotions" at the Company's resorts "in preparation for the November 2009

opening of CityCenter . . . ." With news that CityCenter's opening was still on track, the price of

MGM's stock increased 3.81% to $92.85 per share on volume of more than 2 million shares traded.

The stock price also rose 2.21%, to $94.90 per share, the following day.

39.    On October 30, 2007, MGM issued a press release announcing "record" financial

results for its third fiscal quarter, providing, in pertinent part, as follows:

> LAS VEGAS, Oct. 30 /PRNewswire-FirstCall/ -- MGM MIRAGE (NYSE: MGM)
> today reported record third quarter 2007 financial results, achieving diluted earnings
> per share from continuing operations of $0.62, a 17% increase over the $0.53 per

- 15 -

share earned in 2006. Earnings benefited from continued year-over-year growth in net revenues and income recognized during the quarter from Hurricane Katrina insurance recoveries.

Net revenues increased 6% to $1.9 billion, a record third quarter for the Company. *The Company continues to generate significant increases in revenues from its non-gaming operations as activity at the Company's restaurants, nightclubs, and shows accelerated across the board and room rates remain strong*.

40.     Commenting on the results and the Company's "growth initiatives," Defendant Lanni

stated, in pertinent part, as follows:

> "*Our growth initiatives*, including strategic relationships with Dubai World and Kerzner International, *reflect our ability to leverage our tremendous assets and creative energy to grow the Company* . . . Our all-new MGM Grand Detroit is the clear market leader right out of the gate. *We are well underway in creating the most important Las Vegas development ever, CityCenter*, and we believe our MGM Grand Atlantic City project will have a similarly profound impact on the Atlantic City market."

41.     Defendant Murren also made positive comments regarding the financial results,

current operations and growth initiatives, as follows:

> *"Key volume indicators that we have come to rely on to gauge our Las Vegas business remain strong. These metrics suggest continued growth over the upcoming quarters* . . . We have many opportunities to increase our future profits through initiatives deployed throughout the remainder of this year and into 2008. The opening of our Detroit resort has been a tremendous success and we are only a couple of months away from opening in Macau. *Both of these resorts will substantially add to our future cash flows and earnings."*

42.     Defendant D'Arrigo, MGM's Executive Vice President and CFO, also emphasized

the Company's growth initiatives and added that the Company's had ample access to capital under

its existing credit facility, stating, in pertinent part, as follows:

> "Our recent strategic transactions will have a profound impact on our financial position and allow us to execute our many growth initiatives . . . Following the transactions with Dubai World, *we will have significant borrowing capacity under our senior credit facility and no significant debt maturities in 2008*."

- 16 -

43.     Following the issuance of the press release, Defendants Lanni, Murren and D'Arrigo,

along with other MGM representatives, conducted an earnings conference call with analysts and

investors during which they reiterated the Company's financial results and expounded on its

prospects.

44.     In his opening remarks, Defendant Lanni focused on MGM's current financial

condition and growth prospects, particularly with respect to CityCenter, stating, in pertinent part, as

follows:

> Top-line performance for the company was strong, as net revenues increased 6% to
> an all-time record of $1.9 billion. Hotel and nongaming results led the increase in
> revenue this quarter. Las Vegas Strip RevPAR for the company was up 6% versus
> 2006. That represents our 17th consecutive quarter of RevPAR increases on the strip
> here in Las Vegas. *Many of our Las Vegas Strip properties had record third quarter*
> *hotel revenues, which is a very strong indicator of the strength of this market and*
> *the continued effectiveness of our operations and the management of those*
> *operations*.
>
> *     *     *
>
> On CityCenter, we entered into a joint venture agreement with Dubai World for 50%
> of City-Center. It should be noted that we will continue to be the developer of that
> project. Once again, we will operate CityCenter, and we will receive a management
> fee for doing that. *This transaction truly represents a paradigm in our growth*
> *strategy. With us joining a strategic financial partner in Dubai World to leverage*
> *our management ability and real estate asset is the most effective way possible that*
> *we could even think of*.

45.     At the same time, however, Lanni was forced to acknowledge rising construction

costs associated with CityCenter, although he attributed the increase to the complexity and quality of

the construction, as follows:

> *At CityCenter, the construction budget has increased as we noted today*
> *approximately $400 million, from $7.4 billion to $7.8 billion*. It's always our goal to
> build the finest and the best, and yes, the projects do tend to increase in cost, may
> increase in costs, but we want to be sure that that is an iconic structure at a series of
> structures. *The cost increase is largely due to other factors, though*--the complexity

- 17 -

of the hotel casino podium, the fair buildings, and the Libeskind-designed roof structure over the crystals retail area, which required additional steel, concrete and fabrication, along with additional design changes for exterior lighting and water features and site utility costs.

46. Lanni further represented that "[c]onstruction has made substantial progress during the third quarter" with respect to CityCenter and that its Harmon Residences located there were already on sale and would be opened to the public starting "in early 2008." However, in response to a separate question, he conceded that the $100 million bonus associated with the timely completion of CityCenter was "in flux, but it's certainly not off the table." Notwithstanding City Center's increasing budget, Lanni assured that the Macau resort was not affected by the cost increases and was still "expected to open by the end of this year."

47. In turn, Defendant D'Arrigo represented that MGM's trends continued to remain strong, stating that "[w]e also believe [that] our operating trends, nongaming revenues and operating margins will remain strong." He also highlighted the Company's ongoing investments, stating, in pertinent part, as follows:

Our continued investments in our Las Vegas resorts are providing excellent returns, and we anticipate the planned additional investments in our properties will lead to further increases in property cash flows. We are currently going through our capital allocation process for 2008 and have many exciting high-return projects on the table.

48. Defendant Murren also indicated that management had "very aggressively" managed MGM's balance sheet, and had identified capital investment opportunities, stating, in pertinent part, as follows:

We have been very aggressive acquirers of our stock. For example, in the past, *we have managed the balance sheet very aggressively and, I think, prudently from a standpoint of risk*, and we've been able to plant some significant development seeds over time. So we're going to go to our board once Terry approves, first, of course, our budgets for '08. And we're going to our board in January. It would be a career-

threatening move to give you numbers now before we present it to our board. ***But I would say that our opportunities are better than they've been before***.

49. The October 30, 2007 statements set forth above, as well as the other positive statements detailed above that Defendants made at or about that time, were materially false and misleading for all of the reasons that the August 2, 2007 statements were. These statements were also materially false and misleading because, *inter alia*: (i) Defendants had not prudently managed MGM's balance sheet from a standpoint of risk, because they unduly exposed the Company to an unreasonable degree of risk in connection with financing the CityCenter project; and (ii) MGM's financial performance was not a reasonable indicator of future trends in the industry.

50. Then, on December 5, 2007, MGM issued a press release announcing that the Board had approved a share repurchase program pursuant to which the Company would purchase up to 20 million shares of its common stock. MGM also announced that it had "repurchased 5.08 million shares in the current quarter to date, thereby leaving 420,000 shares outstanding under the previous share repurchase program approved in July 2004."

51. In response to this news, the Company's stock price rose, after previous declines, over the next two days, increasing 2.74% to $87.86 per share, and 3.48% to $90.92 per share, on December 5 and 6, 2007, respectively. As intended, the share purchase had the effect of assuring the market that the Company's financial condition was strong and could endure the increasing volatility in the financial markets and the resultant tightening of the credit markets.

52. Subsequently, on January 9, 2008, MGM issued a press release announcing that it, together with an affiliate of Dubai World, would jointly make a cash tender offer for up to 10 million shares of the Company's common stock at a price per share of not less than $75.00 and not greater than $80.00. In response, Jefferies & Co. ("Jefferies") issued a positive research report concerning

- 19 -

MGM, in which it noted that the share purchases "**should limit the downside on this stock**." [Emphasis in original.] Thus, once again, the market was assured that the Company's financial condition was strong, and Dubai World's willingness to engage in the joint tender offer reinforced that impression. After a string of consecutive declines in the Company's stock price, the price rose 5.44% to \$73.79 per share on this news on heavy volume of nearly 4.4 million shares traded.

53. Thereafter, MGM's stock price again suffered a string of consecutive declines, losing 10.73% in the three-day trading period between January 11 and 15, 2008. However, on January 16, 2008, MGM issued a press release announcing that it and Dubai World's affiliate would increase their offer to purchase 15 million, as opposed to 10 million, shares of the Company's common stock. They also announced that they had set the "tender price," at which they would pay for the shares, at \$80.00 per share, as opposed to the previously announced range of between \$75.00 and \$80.00 per share. Yet again, the market reacted positively, and, in response to this announcement, the Company's stock price rose 6.17% to \$70.57 per share on extremely heavy volume of more than 8 million shares traded.

54. On February 7, 2008, MGM issued a press release announcing its preliminary results for the fourth fiscal quarter of 2007, providing, in pertinent part, as follows:

Excluding the CityCenter gain [then expected to be approximately \$1 billion, before income taxes], the Company expects fourth quarter diluted earnings per share (EPS) from continuing operations to be in the range of \$0.60 to \$0.65, compared to \$0.68 in the prior year. Including \$2.10 to \$2.25 of expected EPS from the CityCenter gain, the Company expects to report EPS in the \$2.70 to \$2.90 range.

55. In addition, the press release, which noted that Defendant D'Arrigo had "commented on the trends noted in the fourth quarter and into the first quarter," quoted him, in pertinent part, as follows:

"We experienced solid volumes in highend gaming play led by a 17% increase in our baccarat volume during the fourth quarter, and achieved our 18th consecutive increase in REVPAR (revenue per available room) at our Las Vegas Strip resorts . . . *Overall, composite fourth quarter operating results at our Las Vegas Strip resorts were comparable to the prior year*. Our estimated earnings for the month of January 2008 are a few cents per share below those achieved in the month of January 2007, with estimated Las Vegas Strip REVPAR a few percent lower than January 2007."

56.    As the press release further noted, D'Arrigo "also provided an update on the

construction budget for CityCenter," stating, in pertinent part, as follows:

"We are still in the process of finalizing guaranteed maximum price contracts with our general contractor for several elements of the project . . . Based on the current status of these negotiations, *we expect the construction costs of CityCenter to be $300 million to $600 million higher than our previous estimate of $7.8 billion*."

57.    Although the Company' stock price rose 3.04% to $71.81 per share that day, it

declined 5.40% to $67.93 per share the following day, on volume of nearly 6.1 million shares traded

– approximately 2.6 times the trading volume of the previous trading day. In addition, on February

8, 2008, Wachovia issued an analyst research report concerning MGM, in which it highlighted the

$300 million increase in CityCenter costs and lowered its full-year estimates for 2008 and 2009 to

$2.5 billion and $2.6 billion, respectively, as compared to $2.7 billion and $2.9 billion, previously.

Wachovia indicated that it "remain[ed] somewhat cautious on the outlook for MGM" and noted that

the Company "is also continuing to support the stock price with its own repurchases."

58.    On February 15, 2008, MGM issued a press release announcing the preliminary

results of its joint tender offer with Dubai World's affiliate, indicating that a preliminary count had

resulted in "an updated estimated proration factor of approximately 13.7% instead of 14.7%." In

response, MGM's stock price declined 6.01% to $66.14 per share on volume of more than 4 million

shares traded.

- 21 -

59. Then, on February 21, 2008, MGM issued a press release announcing "record" financial results for the fourth quarter and full year of fiscal 2007, which largely confirmed the preliminary results that it had announced on February 7, 2008. The press release provided, in pertinent part, as follows:

LAS VEGAS, Feb. 21 /PRNewswire-FirstCall/ -- MGM MIRAGE (NYSE: MGM) today reported record fourth quarter and full year 2007 financial results. The Company earned $2.85 per diluted share from continuing operations in the fourth quarter, compared to $0.68 in the prior year. The current quarter included a significant gain, $1.03 billion before income taxes, on the contribution of CityCenter to a joint venture on November 15, 2007.

60. The press release also disclosed that pre-opening costs had continued to climb, particularly with respect to the Macau resort, as follows:

In addition, the Company incurred higher preopening expense -- *$38 million in the current quarter versus $9 million in 2006*. Preopening and start-up expenses in the 2007 quarter included *$25 million related to the Company's share of preopening expenses at MGM Grand Macau*, $7 million related to MGM Grand Detroit, and $5 million related to CityCenter.

61. Nevertheless, commenting on the results, Defendant Lanni continued to highlight the Company's positioning, prospects and growth initiatives, stating, in pertinent part, as follows:

"Even while closing on the most historic transaction in our Company's history -- the CityCenter joint venture and strategic relationship with Dubai World -- our dedicated employees delivered exceptional operating results . . . *Our Company is ideally positioned to excel domestically and internationally*. We have the premier resorts in our markets and a focused management team, and *we continue moving forward on substantial growth initiatives*."

62. Defendant Murren also commented favorably on the Company's results and growth prospects, stating, in pertinent part, as follows:

*"In the fourth quarter, our overall business remained solid, and we continue to look for opportunities to maximize both customer volume and operating margins . . . .* Our strategy of executing profitable targeted capital investments can be seen across our resorts. Luxor now features an array of dining, nightclub and entertainment

options, all opened within the past few months. Mandalay Bay has an entirely new standard room product. We believe our customers are very discriminating, and appreciate the difference in strategy between our company and our competitors -- a difference which will likely only become more pronounced over time."

63. Finally, Defendant D'Arrigo likewise made highly positive statements, commenting,

in pertinent part, as follows:

*"Our Company is financially well positioned to carry out planned growth initiatives*, including reinvestment in our existing resorts, while at the same time maintaining a strong balance sheet . . . *Our capital allocation strategy remains sound*, and will allow us to prudently expand our brands both domestically and in international markets, while maximizing shareholder value."

64. Following the issuance of the press release, Defendants Lanni, Murren, D'Arrigo and

Baldwin, as well as other MGM representatives, conducted an earnings conference call with analysts

and investors during which they reiterated the Company's financial results and expounded on its

prospects.

65. In his opening remarks, Lanni represented that the Company's "industry-leading

operating margins remain very strong excluding, obviously, the items discussed in the [press]

release." He also stated that "[a]s a result of continued revenue growth and stable margins, we

earned record profits in each of the four quarters last year." Lanni further addressed the Company's

growth prospects, stating, in pertinent part, as follows:

*We entered into several new joint ventures and strategic partnerships with world class organizations which will truly set this framework for near term and long-term growth. Our future in this year 2008 and well beyond is very bright*, and our management team will remain focused on expanding our operations domestically and internationally, and operating our existing resorts to maximize their appeal to our visitors.

66. In concluding his opening remarks, Lanni represented that the Company had access to

capital in connection with the development of a second site on the Cotai Strip in Macau, stating that

- 23 -

"[o]ur joint venture recently amended the bank credit facility to provide for an additional $400

million to fund expansion and provide seed money for our second site on the Cotai Strip."

    67.    Likewise, during his opening remarks, Defendant Murren spoke positively of MGM's

prospects, even while acknowledging that challenging economic conditions were adversely

impacting the Company:

> So on balance, we're pleased with the fourth quarter results. *We are well aware of
> what's happening in the economy* . . . .
>
> *We're well prepared to handle these challenges*. Certainly, more so than any of our
> competitors here in Las Vegas or in the industry. *And we feel like we have some
> good momentum*, particularly as the year progresses as we get into the third and
> fourth quarter . . . .

    68.    In turn, Defendant Baldwin represented that the development and construction of

CityCenter remained "on schedule":

> Update on CityCenter, *construction continues and remains on schedule with an
> anticipated opening in late 2009*. We currently have 5,600 construction workers on
> the site. The number of construction workers on the site is expected to peak later this
> summer and a total of 7,000. The hotel casino tower at CityCenter is expected to top
> out in September of this year. The concrete structure currently is up to level 36.
>
> Drywall stud framing is ongoing through level 27, structural steel is completed in the
> west podium and 65% complete in the east podium, and 60% complete in the
> convention center. Vdara is expected to top out in August. Concrete structure is
> complete through level 42. Currently, curtain wall installation is complete to level
> 31. The Mandarin Oriental Tower is expected to top out in September. Concrete's
> through level 24 and curtain walls through level 15.
>
> Concrete structure for the Veer Towers is complete through level 6 with one tower,
> at level 2 with the other *while concrete decks have been placed through level 4 at
> the Harmon Hotel*. Structural steel for Crystals retail area is approximately 80%
> complete. CityCenter residential sales up-date, despite a tightening housing and
> credit environment that Jim's been discussing *we continue to be satisfied with our
> residential sales results*.
>
> In the fourth quarter, 97 units were sold for a total of $141 million. To date, we have
> now sold 1,336 units for over $1.67 billion with an average sales price of $1,269 per
> square foot. *We're also encouraged that we have not yet received any contract*